## HATHAWAY'S ADMINISTRATOR *v.* NATIONAL LIFE INSURANCE COMPANY.

*Evidence. Declarations to Medical Attendants. Opinion of Non-professional Witnesses upon the Question of Insanity. Practice. Medical Experts. Life Insurance.*

In assumpsit upon a life insurance policy containing a proviso that the policy should be void if the assured committed suicide, the question was whether the assured was insane at the time he killed himself. It was *held* that his physician, who was consulted by him two or three weeks before his death, might testify to declarations

then made by him, that "at times he felt as if he must take his life—that he had an impulse to take his life;" such declarations being directly in the line of inquiry that the physician would naturally make, to ascertain the then present condition of his patient, and material to that end, and important as tending to show the nature and extent of the disease he was called upon to treat.

The opinion of persons not experts, upon the question of insanity, is admissible in this state, when based upon facts within their own knowledge and observation to which they have testified ; and the fact that such persons did not form their opinion at the time they saw and observed the facts testified to by them, does not render their opinion inadmissible.

A question not raised and passed upon in the County Court, cannot be raised in the Supreme Court.

The principle is well settled, that physicians and surgeons of practice and experience, are experts; and that their opinions are admissible in evidence upon questions that are strictly and legitimately embraced in their profession and practice; and it is not necessary that a witness of this class should have made the particular disease involved in the inquiry, a speciality, in order to make his testimony admissible as an expert.

Hypothetical questions may be put to medical experts, if the testimony tends to establish every supposed fact embraced therein. Nor are answers to such questions objectionable because they include considerations not referred to in the questions, as constituting the basis of the opinion given, and such as the testimony tends to prove, and as might properly have been included in the questions.

Insanity short of delirium or frenzy whereby all power of self-will and control is lost, will excuse the act of suicide, and prevent the avoidance of a life insurance policy containing a proviso that it shall become void if the assured commits suicide.

In assumpsit upon a policy containing such a proviso, the court charged the jury, that "if the assured had sufficient mind, reason, and judgment to rationally consider and determine whether he preferred to die or to live, and, for any reason, determined that he preferred to die, and in pursuance of that determination, contemplating what he was doing, he took his own life, no recovery could be had upon the policy ; that it was not enough to entitle a recovery, that at the time he took his life his mind was unsound to some extent, nor that it was so unsound that he could not distinguish right from wrong, but that it must have been so unsound that it could be seen that the unsoundness killed him ; but that if his mind, reason, and judgment became impaired, and an insane idea that he must take his own life entered his mind, and got hold of it, and his mind, reason, and judgment grew weaker, and that idea stronger, until his mind was overturned, and the idea got control of his reasoning faculties and of him, to that extent that he could not resist it, but was compelled to and did yield to it, and take his life, so that, although his mind contrived the means by which his life was taken, and his physical strength carried them out and took it, —in reality this insane idea or impulse, and not his mind and will, took his life—the plaintiff was entitled to recover." *Held*, that the charge was quite as favorable to defendant as the law allowed.

ASSUMPSIT on a policy of insurance issued by defendant, insuring the life of George C. Hathaway for his own benefit. There was a proviso in said policy that it should " be void and of no effect" if said Hathaway ",shall die by suicide." The defendant pleaded

the general issue, with notice that said Hathaway "died by sui-
cide;" that he voluntarily and willfully took his own life by in-
tentionally shooting himself through the body with a pistol, for the
purpose of destroying his life. It was conceded that said Hatha-
way died on June 1st, 1871, from a pistol wound inflicted by
himself in the city of New York. The plaintiff gave said policy
in evidence, and the proof of the death of said Hathaway, furnished
by plaintiff to defendant soon after his death, and the testimony of
Dr. Pond, that he was a practicing physician and surgeon, and
was the physician of said Hathaway for several years prior to his
death; that Hathaway consulted him a number of times during
the winter of 1870 and the spring of 1871, the last time two or
three weeks before his death, and that said Hathaway consulted
him as to some slight disturbances and nervousness during the first
part of the winter; and offered to prove by the witness that during
the last consultation, said Hathaway stated that at times, he felt
as if he must take his life—that he had an impulse to take his
life; to which evidence the defendant objected. Objection was
overruled, and the evidence admitted, and defendant excepted.
The witness also testified as to Hathaway's appearance at the time;
that from his eyes, he seemed to be nervous; and gave his opinion
that, from his acquaintance with him, he thought he must have
been insane at the time he committed suicide.

The plaintiff gave evidence showing that Hathaway was married
in 1863; that his wife died in 1865; and tending to show that he
was much attached to his wife, and deeply afflicted by her death,
and his spirits depressed thereafter; that he had been engaged in
active business up to the time of his death; that his habits of ex-
travagance increased after his wife's death, and were so during
the last few months of his life; that during the last six months of
his life, he purchased many things he did not seem to need, among
which were toys and fancy articles, and sought amusements, and
at times seemed to take pleasure in trifling and childish amuse-
ments; that, at times, he seemed depressed and low spirited, ab-
sent-minded and absorbed in thought, and at other times, gay;
that at times his eyes looked glaring or glassy, and he seemed to
have some matter upon his mind that troubled him.

43

Plaintiff offered to prove by persons not experts, but who saw him, and noticed and knew from their own observation of the matters put in evidence as above, and who testified to what they saw and observed, that in their opinion, based upon what they had seen and observed, to which they had testified, said Hathaway was insane at the time they so saw and observed him; to which evidence and opinions the defendant objected; but the objection was overruled, and the evidence admitted; to which defendant excepted. Said witnesses testified that they *now* thought he was insane, but did not think so at the time before his death.

The plaintiff also offered the testimony of a doctor who testified that he was a practicing physician, and had made insanity a special study, and was personally acquainted with Hathaway, and had once, two or three weeks before his death, noticed the glassy appearance of his eyes, and his abstracted manner; that in his opinion he was insane; that his insanity would come under the head of *melancholia*, and that the natural result of the insanity he suffered would be self-destruction—might be, but would not inevitably be; to which the defendant objected. Objection overruled, testimony taken, and defendant excepted.

The defendant gave evidence tending to show that said Hathaway was always an extravagant and fanciful man, nervous and excitable, accustomed to good society, and proud-spirited; that he had been in active business ever after his wife's death, and up to the time of his death; that for two or three years prior to his death, he had been the treasurer of a marble company in Rutland, and had given bonds as such treasurer, and that his father was his surety upon said bond for five thousand dollars; that his accounts as such treasurer had been regularly kept, settled, and balanced up to October, 1870; that from that date forward, his entries had not been made upon his treasurer's book, but had been kept on papers found after his death; that from his accounts kept upon said papers, he was, after his death, found to be a defaulter as such treasurer, for over five thousand dollars, all of said default appearing to have occurred after October, 1870; that he left in the room in New York where his body was found, a letter to said marble company, fully explaining his business as treasurer, and

from which were found the papers and memoranda necessary to bring up his accounts. as treasurer, all as he suggested in his said letter.

The defendants gave in evidence the application of said Hathaway for said insurance, and the surgeon's certificate attending it, but no question was made concerning them. The defendant also gave evidence tending to show, that on the evening of May 31, 1871, said Hathaway applied at a hotel in New York for rooms with a bath-room attached, and insisted upon rooms with bath-room attached, and was furnished such accommodations; that he then appeared well and rational; that at about ten o'clock the next morning, he called for paper and envelopes, which were furnished him by the hotel keeper; that in the afternoon, and till three o'clock, his room was found to be locked on the inside, and at that hour it was found unlocked and the door a little ajar, and at five o'clock of the same afternoon he was found dead in the bath-tub in his room, with a pistol at his side, with one chamber or barrel discharged, and a wound through his body, from which he died; that he left upon his table in his room, found at the time his body was discovered, two letters, written upon the paper and enclosed in envelopes furnished him as aforesaid, one of which was the letter to said marble company, and the other was directed, " To my friends;" which letters, and the envelopes with the directions thereon, were given in evidence by defendant, but it is unnecessary to state their contents. Defendant's evidence tended to show that facts stated by him in said letters were true; that his said accounts and memoranda were found as stated in said letter; and that his treasurer's books were not kept at his office after October, 1870.

The plaintiff gave further evidence tending to show, that there was a change in the appearance of Hathaway for the last six months of his life—a change in the matter of taste and inclination to spend money, and to buy many things not necessary for him —a change from his cheerful habit to one of depression, gloomy and abstracted in manner; that his father, now an elderly man, was habitually absent-minded, and subject to spells of despondency, and low-spirited like his son, and that at times Hathaway had a

wild or glaring look in his eyes, and seemed in great trouble; that when he was arranging to go away from Rutland the last time, he seemed undetermined as to which way he should go, whether to Vergennes or to Boston, and did not determine till he got to the depot, and requested that the family in which he boarded should be up and have the house lighted and supper prepared when he returned on the night train at a time he named. Plain-tiff also offered the testimony of physicians and surgeons as ex-perts, one of whom was Dr. Goldsmith, who testified that he was a physician and surgeon, and had been in practice thirty years, and plaintiff propounded to them the questions as given below, to which, and the answers thereto as given, defendant objected.

Objection overruled, and the testimony taken, to which defen-dant excepted.

Q. 1. Suppose a man having consulted his physician in regard to the impulse to take his own life, stating to his physician that he had such an impulse, shortly afterwards took his own life, la-boring all this time under more or less depression of spirits, and his eyes at times presenting a wild or glaring expression, what, in your opinion, was the condition of his mind at the time of his death, sane or insane?

A. If a man should come to me and state that he had an almost uncontrollable impulse to take his own life, and if he soon after took his own life, the presumption in my mind would be, that he was insane at the time he consulted me; and if, upon inquiring into the previous history of the man, I should find that he was the subject of profound melancholy, the presumption would gain in force. If I found upon further inquiry, that in his manner and appearance there was abstraction, that there was in those times in his eye, a sort of hunted look, such as would accompany a man carrying great grief — such a look as makes one ask a friend, "What ails you?"— if all these things were associated with speeches and actions in his daily life, such as would in themselves be mere eccentricities, then I should say he was clearly and un-mistakably insane.

Q. 2. In the case before supposed, suicide having been com-mitted, what is the presumption?

A. The act of suicide, while not in itself showing anything clearly, yet, taken with the other circumstances, would make the demonstration of insanity complete.

Q. 3. Is suicide, more often than otherwise, a proof of insanity?

A. It is most often a proof, but not necessarily so.

Q. 4. Suppose this self-destruction was apparently the result of such deliberation as is indicated by the letters now shown you [which were the letters put in evidence by defendant], and by the circumstances of his death, namely, that being a resident of Rutland, and leaving Rutland on or about Thursday, and about the next Tuesday going to a hotel in New York, registering at hotel under an assumed name, calling for a room with a bath in it, and being found dead the next day in said bath, naked, with a pistol at his side and a bullet hole through his breast,—whether such deliberation would or would not change your opinion as to his insanity, and the cause of his suicide?

A. The deliberation with which a man commits suicide, does not militate against the idea that the act is that of an insane man, for the reason that a man may be sane in some part of his mind and insane in others. He may be sane in the logical faculties, and insane in his perceptions—insanity is frequently not in the reasoning, but in the delusion. Have read the letters carefully; the business letter might have been written by a sane man—the second letter shows a morbid state of mind. The letters do not change my mind.

Q. 5. What state of mind would, in your opinion, the letter to his friends indicate, taken in connection with the other supposed facts in the previous question?

A. It appears to be written by a man who was laboring under some great grief or apprehension, and who was in just that state of mind which is so frequently followed by suicide.

Q. 6. What state of mind do you refer to?

A. Profound melancholy.

Another physician called as an expert was Dr. Mead, who testified that he had been in practice as a physician seven years, at first in King's County Insane Asylum, at Brooklyn, New York, nearly three years. The question first above stated was propounded to him, and he answered, "One would naturally suppose he was insane."

Q. Whether or not, in your opinion, a man may have an uncontrollable impulse, impelling him to commit suicide, and at the same time be apparently rational upon all other subjects?

A. I think this a difficult question to answer. I think that in almost every case you would find other symptons to aid an opinion — such as the history of the case. There are always other symptoms that would help to form an opinion.

Q. If a man is once possessed of a suicidal impulse, state whether, in your opinion, his recovery is or is not probable ?

A.   In all cases where a person has once attempted suicide, he will almost always commit suicide.   So that if a man was deeply impressed with this suicidal impulse, it would sometime result in suicide.

The fourth question above stated was propounded to the witness.

A. The letters alone do not prove anything as indications of insanity.   The deliberate planning of the case mentioned, would indicate to my mind that his self-destruction was the result of insanity.

Defendant requested the court to charge the jury as follows :

1.   Suicide is not evidence of insanity, but the law presumes every man to be sane, and the burthen of proving insanity is upon the plaintiff.

2.   That there are degrees of insanity, and that no degree of insanity short of delirium or frenzy, and whereby the deceased lost all power of self-will and control, will excuse the suicide, and entitle the plaintiff to a verdict.   That the state of the mind of the said Hathaway at the time he shot himself, must have been that of the "madness of delirium," to charge the defendant under this policy.

3.   The proviso in this policy, as to suicide, exempts the defendant from liability, if said Hathaway took his own life, although his act in so doing may be distinctly traced as the result of a diseased mind, if at the time he shot himself, he had sufficient reasoning powers to know the natural result of his act.

4.   If the act of self-destruction was the voluntary and willful act of said Hathaway, he having at the time sufficient power of mind and reason to understand the physical nature and consequences of such act, and having at the time a purpose and intention to cause his own death by the act, it avoided the policy.

5.   This action is founded and must rest upon the contract made by the defendant and the assured ; and by the proviso in question in this policy, it was intended to except from the policy all cases of death by the voluntary act of the assured, when his act of self-destruction was the result of intention—the assured knowing the nature and consequences of his act of shooting himself—although it may have been done under an insane delusion which rendered him morally and legally irresponsible, incapable of distinguishing between right and wrong, and which, by disturbing his reason and judgment, impelled him to its commission.

6. If the jury find that the letter directed "To my Friends," and the writing on the envelopes, both attached to the deposition of B. A. Hathaway, and the letter to the marble company, put in evidence, are in the handwriting of said Hathaway, and that the same were written the day of his death, they constitute such evidence of soundness of his mind at the time, that the jury would not be warranted by anything else shown upon this trial, in finding such mental unsoundness as would justify a verdict for the plaintiff.

The court, among other things, charged the jury in substance, that if Hathaway had sufficient mind, reason, and judgment to rationally consider and determine whether he preferred to die or to live, and he, for any reason, determined that he preferred to die, and in pursuance of that determination, he, comprehending what he was doing, took his own life, the plaintiff would not be entitled to recover the amount insured. But that if his mind, reason, and judgment became impaired, and an insane idea that he must take his own life entered into his mind, and got hold of it, and his mind, reason, and judgment grew weaker, and that idea stronger, until his mind was overthrown, and the idea got control of his reasoning faculties and of him, to that extent that he could not resist it, but was compelled to and did yield to it and take his life, so that, although his own mind contrived the means by which his life was taken, and his physical strength carried them out and took it, in reality, this insane idea or impulse, and not his mind and will, took his life, the plaintiff was entitled to recover. That it was not enough, to entitle the plaintiff to recover, that at the time he took his life, his mind was unsound to some extent, nor that it was so unsound that he could not distinguish right from wrong, but that it must have been so unsound that it could be seen that the unsoundness killed him. That his statements to Dr. Pond, so far as he was making them as statements of his symptoms and feelings to a medical adviser for advice or treatment, were evidence that his symptoms and feelings were as he stated them to be, so far as he had capacity to and did make them understandingly and correctly, and his statements had been testified to accurately. That the fact that he did take his own life in the manner the evidence showed, would not alone be sufficient ev-

idence of insanity; but still, it was to be weighed and considered as a circumstance in connection with all the other circumstances in the case, for the purpose of determining whether he came to his death by his own free will, or was impelled to it by an insane impulse that he could not resist; and that the burden of proof was on the plaintiff to show that mental disease killed him.

The court did not further comply with defendant's 1st, 2d, 3d, and 4th requests. To the refusal to comply with the 2d, 3d, and 4th requests, and to so much of the charge as related to insanity of the intestate, because it allowed the plaintiff to recover when the intestate had so much capacity, and to so much of the charge as related to the statements of the intestate to Dr. Pond, the defendant excepted.

The court charged in respect to the testimony of the experts, among other things, that if any material fact in the cases supposed to them, did not exist in this case, or any material fact existed in this case that was not put into the cases supposed, the opinions given on the cases supposed would be, so far as they varied, not applicable to this case, and to that extent were not to be considered in determining this case.

*W. H. Smith* and *Prout, Simons & Walker*, for defendant.

It seems well settled, that parties are not to be held to the *literal terms* of this class of provisos in policies of insurance—that *some* qualifications are admissible; the *extent* constitutes the point of discussions and the differences in judicial opinions. It seems also well settled, that the various forms of expression in this class of provisos, as, " shall die by suicide," " shall commit suicide," and " shall die by his own hand," are to be construed as having the same meaning, and subject to the same qualifications. The earlier and leading English cases of *Borradaile* v. *Hunter*, 5 M. & G. 637, and *Clift* v. *Schwabe*, 3 M. G. & S. 437, settled the rule of construction there, that all such provisos " *included all acts of voluntary* self-destruction "—the man, at the time, having sufficient powers of mind and reason to understand the " *physical* nature and consequences of his act, and having at the time the *purpose* and *intention* to cause his own death by the act "—the

question of moral accountability being wholly immaterial. *Breas-ted's* Case, 8 N. Y. 299—the first American case—is put upon the express ground that it does not appear that the act was *voluntary ;* and held that the act must be *criminal*, and the mind of the as-sured be able to distinguish between right and wrong, to avoid the policy. This was the decision of a nearly equally divided court, and has been substantially overruled by the same court in recent cases. The leading case of *Dean* v. *American Life Ins. Co.* 4 Allen, 96, in which Ch. J. BIGELOW very ably reviewed all the former decisions on the subject, laid down the true principles upon which this class of cases should be tried and determined. See also, *Cooper* v. *Mutual Life Ins. Co.* 102 Mass. 227 ; Bliss on Life Ins. 381, *et seq. Estabrook's* Case, 54 Me. 224, is relied upon to establish a different doctrine. It will be noticed that the in-surance in that case was by the father upon the life of his son who committed suicide, which is made a ground of distinction by the court ; and besides, no report of the case at hand shows what *degree* of insanity existed. True, the court argues that any de-gree would be sufficient to avoid the proviso, and that nothing but the *criminal* act of a being *legally* and *morally* responsible, will avoid the policy. No authorities are cited by the judge, and no reference is made to the opinions of other courts, and cer-tainly the case stood alone at that date. This question was be-fore the Supreme Court of the U. S. in *Terry* v. *N. Y. Mutual Life Ins. Co.* 15 Wall. 580, which, in its *results*, is an authority for the plaintiff here, and is in conflict with substantially all other cases reported upon this subject. *Van Zandt* v. *Mutual Benefit Ins. Co.* 55 N. Y. 169, and *McClure* v. *N. Y. Mutual Life Ins. Co.* 55 N. Y. 651, are the latest cases involving the questions in this case, and they seem full authorities for the defence here.

It will be observed that most of the cases cited limit the re-quired mental capacity of the assured to the "*physical* nature and consequences of his act, to avoid the proviso." Upon a re-view of all the authorities, the Massachusetts law, followed as it now is by the courts of New York, seems most in accordance with the intention of the parties to this class of contracts. Bliss on Life Ins. 392, *et seq.*

44

The defendant's requests to charge, as will appear upon examination, cover and follow the principles established in the English, the Massachusetts, and the New York cases cited above—indeed, identical with one of the requests in the *Van Zandt* case that was sustained by the court. The second request is sustained by the Massachusetts cases, especially by *Cooper's* case. The fifth, by *Dean's* case.

It can hardly be claimed that the charge of the court in this case met the requests of defendant, or that it adopts and follows the principles established by the prevailing leading cases cited above. To have " mind, reason, and judgment sufficient to *rationally* consider and determine whether he preferred to die or to live," calls for the highest order of reasoning faculties. No man can " *rationally* consider and determine " any such question. In *law* there is only one form of insanity—" that which affects the mind." " Moral insanity is not admitted as a bar to responsibility for civil or criminal acts," unless there is *intellectual* disturbance or insanity. 16 N. Y. 62 ; *Farrar* v. *State*, 2 Ohio St. 54 ; *State* v. *Spencer*, 1 Zab. (N. J.) 196 ; *Fisher* v. *People*, 23 Ill. 283 ; *Loeffner* v. *State*, 10 Ohio St. 598 ; Wharton's Medical Jurisp. 55, 59, 65, note ; Taylor's Medical Jurisp. 774, 859.

Under the charge, what questions are submitted to, and what must have been the findings of, the jury ? Either that the assured had not the mental capacity specified in the first proposition —and having *less* than the *test* submitted to them, the insurer is liable—or that the assured was overpowered by the *insane idea* and *impulse* after its *progressive* workings upon his mind, and by which his life was taken, and so the insurer is liable. Either of these findings under this charge, would justify the verdict ; and neither is involved by the claims and evidence in the case.

The exceptions of defendant to the admission of evidence were well taken and valid. The declarations of Hathaway, made weeks before his death, as to his feelings and impulses, for the purpose of proving his insanity at the time of his death, should not have been received. *Kent* v. *Lincoln*, 32 Vt. 597 ; 1 Greenl. Ev. s. 102 ; *McClure* v. *Mutual Life Ins. Co. supra.*

The opinion of Dr. Pond, who is not shown to have been an

expert in such matters, that Hathaway "must have been insane when he committed suicide," was not admissible, as it did not appear he had any such suspicions when he last saw him some weeks before his death, and his opinion is manifestly based upon the erroneous idea that suicide is always evidence of insanity. The same objection, with still more force, applies to the testimony of the other witnesses not experts, who testified that they did not think him insane till *after* he committed suicide, and then *did* think he was when they saw him. The evidence of Drs. Goldsmith and Mead, *as taken*, was objectionable, and ought not to have been admitted, and should not have been permitted to go to the jury. The first question to them was not wholly fair, as covering the facts in the case—it was only " at times " he had the " feeling he must take his life "—he was not depressed in his feelings " all the time." But the answer of Dr. Goldsmith was still more unfair, and his opinion based on his *supposed* case, was wholly inadmissible as not supported by the facts in the case. The 3d interrogatory and answer is surely improper—that suicide is evidence of insanity. The law is settled otherwise, however the medical fraternity may regard it. The 4th interrogatory should not have been allowed, as many of the more important elements involved in that part of the case are entirely omitted. Besides, to this question is added, " the cause of his suicide "—calling upon the witness to swear to the cause, and whether he had changed his opinion upon a subject about which he had not and should not be allowed to give evidence.

It is further objected that Dr. Goldsmith is not shown to have been an expert upon the subject to which his testimony was taken as such. Practicing physicians and surgeons are not in fact, and are not held to have the requisite skill and knowledge to be, experts upon such subjects as are really *specialties* in their professions, of which insanity is one. *Fairchild* v. *Bascomb*, 35 Vt. 409.

Dr. Goldsmith, in question 4, is called upon to decide upon the force of evidence ; to compare the evidence upon the two sides, and to say, if the evidence of the defendant is entitled to any weight with the jury, whether it affects his opinion. " Such questions are clearly improper." 35 Vt. 416. Question 5 is

subject to the same objection, and besides, it is not a question for experts. It is a matter for the jury. And so of questions 2 and 3, which do not call for any facts peculiarly within the knowledge of experts, but conclusions for the jury to draw, if inferable from the facts in the case. *Van Zandt's* case.

*Dunton & Veazey*, for plaintiff.

The testimony of Dr. Pond was properly received. The statements of a patient to his physician, as to the character of his sensations and symptoms, made for the purpose of receiving medical advice, are competent evidence under the circumstances of this case. 1 Greenl. Ev. s. 102 ; *Barber and Wife* v. *Merriam*, 11 Allen, 322 ; *Aveson* v. *Ld. Kinnaird*, 6 East. 188 ; *Bacon* v. *Charlton*, 7 Cush. 581 ; *State* v. *Howard*, 32 Vt. 404 ; *Kent* v. *Lincoln*, 32 Vt. 598.

The opinion of persons not experts, based upon facts within their own knowledge, and testified to by them, is admissible to prove insanity. *Morse* v. *Crawford*, 17 Vt. 499 ; *Crane, admr.* v. *Crane*, 33 Vt. 15 ; *Lester* v. *Pittsford*, 7 Vt. 158 ; *Clary* v. *Clary*, 2 Iredell, 78 ; 1 Greenl. Ev. s. 440, note.

The questions put to the experts, and the answers thereto, were properly admitted. *Earl and Wife* v. *Tupper*, 45 Vt. 275 ; *Fairchild et al.* v. *Bascomb et al.* 35 Vt. 398. All the supposed facts embraced in the questions put to the experts, were proved, and no material facts proved to exist were omitted. Even if the questions had been faulty in that they omitted some material facts proved, or embraced facts not proved, and the answers thereto were faulty in the same respect, yet, as the subject-matter of the expert testimony was proper evidence, the defendant has no remedy here, as it made no request to the court to charge in respect to it, and did not except to the charge as given upon this evidence. The only point of exception is as to the admissibility of the evidence, and not upon the disposition afterwards made of it. *Earl and Wife* v. *Tupper, supra.*

The proviso in this policy, that it should " be void and of no effect " if said Hathaway " shall die by suicide," has not the effect to avoid the policy under the circumstances of this case ; and the charge of the court in respect thereto, was as liberal for the de-

fendant as it was entitled to. *Easterbrook* v. *Union Mutual Life Ins. Co.* 54 Me. 224 ; s c. 1 Bigelow Ins. Rep. 139 ; *Breasted et al.* v. *Farmer's Loan and Trust Co.* 4 Hill (N. Y.) 73 ; s. c. 1 Bigelow, 341 ; s. c. 8 N. Y. (4 Seld.) 299 ; s. c. 1 Bigelow, 343; *St. Louis Mutual Life Ins. Co.* v. *Graves*, 1 Bigelow, 736 ; s. c. 6 Bush, (Ken.) 268 ; *Gay* v. *Union Mutual Life Ins. Co.* 2 Bigelow, 4, 15 ; *Terry* v. *Life Ins. Co.* 2 Bigelow, 31 ; *Horn* v. *The Anglo-Austrian, &c. Ins. Co.* 2 Bigelow, 602 ; *Life Ins. Co.* v. *Terry*, 15 Wall. 580 ; *Am. Life Ins. Co.* v. *Isett's admr.* 74 Pa. ; Bishop Crim. Law, 288, 290.

"To constitute suicide, the person must be of years of discretion and of sound mind."—*Blackstone.* "One guilty of self-murder ; a *felo de se.*"— *Webster*. It follows from these definitions, that self-destruction by an insane person, is not suicide.

The words of the proviso are the words of the insurer, not of the assured ; and being ambiguous, as held in all the cases, are to be taken most strongly against those who speak them, and most favorably for the other party. Ch. J. TINDALE, in *Borradaile* v. *Hunter*, 44 E. C. L. 335. In Massachusetts it is held in criminal proceedings, that a party is not responsible for an act done under an uncontrollable impulse that is the result of mental disease. *Commonwealth* v. *Rogers*, 7 Met. 500. This has become well settled law in England and in this country, and a review of criminal jurisprudence shows that the doctrine has grown out of a more enlightened understanding of the subject of insanity. 1 Bennett Lead. Crim. Cases, 42 to 65.

There being evidence in this case tending to show insanity, the court properly submitted the question to the jury, and the court would clearly have assumed the province of the jury, by holding as requested in the 6th request. *State* v. *Potter and Wife*, 42 Vt. 506.

The opinion of the court was delivered by

PIERPOINT, Ch. J. The first question presented by the exceptions is as to the admissibility of the declarations of Hathaway (the deceased), made to Dr. Pond during a professional consultation as to the health of the deceased, had some two or three

weeks prior to his death. It appears that no part of the testimony given by Dr. Pond was objected to except such declarations. The doctor testified that the difficulty under which the deceased was suffering, was of a nervous character, and that during that consultation the deceased told him " that at times he felt as if he must take his life ; that he had an impulse to take his life." These declarations we think were properly admitted. Considering the nature of the disease from which relief was being sought, they were directly in the line of inquiry that the doctor would naturally be making, to ascertain the then present condition of his patient, and were material to that end, and would have an important bearing upon that point, as tending to show the nature and extent of the disease from which he was then called upon to relieve the patient. The admission of this evidence was in accordance with the principle recognized in *State* v. *Howard*, 32 Vt. 404 ; *Kent* v. *Lincoln*, 32 Vt. 598 ; 11 Allen, 322 ; Greenl. Ev. s. 102.

The opinion of persons not experts, upon the question of insanity, are admissible in this state, when based upon facts that are within their own knowledge and observation, they having first testified to such facts—what they have observed as the basis of their opinion. *Lester* v. *Pittsford*, 7 Vt. 158 ; *Morse* v. *Crawford*, 17 Vt. 499; *Crane, admr.* v. *Crane*, 33 Vt. 15. The fact that such persons did not form their opinion at the time they saw and observed the facts testified to, does not render their opinion inadmissible. Ordinarily, such facts would be gathered at different times, consisting of different acts and circumstances, no one of which, perhaps, taken by itself, would suggest the idea of insanity ; but subsequently, when, from any cause, the person is led to group these facts together, and consider them in their relative connection, the opinion is formed. The weight to be given to an opinion so formed, is for the jury.

The next question raised upon the bill of exceptions is as to the admissibility of the testimony given by practicing physicians and surgeons who were offered as experts in relation to the questions involved. No question was made in the County Court that these witnesses were not experts, and no question of that kind was

passed upon there ; hence the question cannot be raised here, although it has been discussed in the argument. The principle is well settled that physicians and surgeons of practice and experience are experts, and that their *opinions* are admissible in evidence upon questions that are strictly and legitimately embraced in their profession and practice ; and it is not necessary that a witness of this class should have made the particular disease involved in any inquiry, a *specialty*, to make his testimony admissible as an expert. If he has, that perhaps may make his opinion of more value than that of one who has not.

But it is claimed by the defence, that the inquiries put to this class of witnesses were improper and inadmissible, and that the answers thereto were not admissible. The questions are hypothetical in their character, but that is no ground of objection. Almost all questions put to experts are of this character, as they are called to express opinions upon a supposed state of facts that are not within their own knowledge, and can be brought to their consideration, ordinarily, only by supposition. Are the questions objectionable as embracing supposed facts which the evidence does not tend to prove ? We think not. On looking at the evidence detailed in the exceptions, it appears that the testimony tended to establish every fact supposed in the questions ; and the counsel (probably with the example of *Fairchild et al.* v. *Bascomb*, 35 Vt. 398, before them) carefully avoided putting their questions in such a form as to subject them to the objection that was found to exist in the question there put ; and we think these questions all come within the rule laid down by this court in that case. There does not appear to have been any conflict in the testimony, or question between counsel as to the truth of all the facts referred to in any of the questions, but only as to their effect upon the question of sanity or insanity.

Neither do we think that the answers are objectionable. Some of them include considerations that are not referred to in the questions, as constituting the basis on which the opinions are formed ; but they are such as the testimony tended to prove, and might properly have been embraced in the questions. This being so, there is no error in its going to the jury ; it only saves coun-

sel the trouble of putting another question. The answers follow substantially the line of the questions, varying in phraseology, but in substance the same. Without following the questions and answers in detail, it is sufficient to say in addition, that we find no error in the admission of the evidence. In respect to the testimony of the experts, the court charged the jury that if any material fact in the cases supposed to them, did not exist, or if all were not included that did exist, the opinions given on the cases supposed, so far as they varied, would not be applicable to this case, and to that extent were not to be considered.

The policy of insurance upon which this action is founded, contains a proviso that said policy shall " be void and of no effect " if the said Hathaway " shall die by suicide." It being established and conceded that the said Hathaway took his own life, the question now is, what is the effect of that act upon the right of this plaintiff to recover upon the policy. Most life-insurance policies contain the same or a like proviso ; and in construing them, it has been repeatedly held, and seems to be well settled, that the terms, " shall die by suicide "—" shall commit suicide," and, " shall die by his own hand," have substantially the same meaning, and are subject to the same qualifications and exceptions. It seems also well settled, and it is conceded in this case, that they are not to be so construed as to have a literal effect. That there are cases where the insured may be guilty of mechanically taking his own life without avoiding the policy, all will concede. The question is, under what circumstances and conditions the insured may take his own life with that result. That a man may be so insane that the taking of his own life will not avoid a policy of this kind, will not be disputed by any one. On the other hand, it will be conceded that a man may be to a certain extent insane, and still have so much sound intelligence and control of his intellectual capacities, that the taking of his own life would avoid the policy with such proviso.

To draw the line that separates the two classes of cases—one that would serve as a guide in all future cases—is not an easy task. Many able men have made the attempt, but I have not seen the case where I thought the effort had been successful.

Fortunately for me, it is not necessary in this case that I should make the attempt, and thereby add another to the instances of failure. The question here is, whether the rule as laid down by the County Court in the charge to the jury, was or was not as favorable for the defendants as they were entitled to. Did the court err in their charge to the jury, and in declining to charge as requested by the defendants ? -

No exception was taken to the charge upon the first request. The first part of that request the defendants were not entitled to. Suicide, like any other extraordinary and unnatural act, has a tendency to show insanity.

The second request the defendants were not entitled to. A charge that no degree of insanity short of delirium or frenzy, and whereby the deceased lost all power of self-will and control, will excuse the act, or that the state of mind must have been that of the "madness of delirium," would give the jury no clear and definite idea of the degree of insanity that they were to find, but would rather lead them to think that the insanity must be of that active, violent, and raging character that is sometimes seen. Such an idea would be entirely erroneous.

We think the defendants were not entitled to the charge as requested in the 3d, 4th, and 5th requests. The standard of intelligence called for by these requests, is quite too low to commend it to one's reason and judgment. Insane persons are not idiots ; they have intelligence ; but it is perverted intelligence. They reason ; but it is not the reasoning of sanity, but of insanity. Insane persons may form plans and execute them, and manifest great shrewdness and mental activity, both in forming and executing them. Insanity does not destroy the intellect — it perverts it, and often renders it more active than when it is in its normal condition. But it is not a sound and healthy mind that is operating, but an unsound and diseased one. It does not follow, because we can see that an insane man knows that if he blows his brains out it will kill him, and that he does that act for that purpose, that therefore the act was that of a sane mind, voluntarily and deliberately done. This idea is well expressed by Judge HUNT, in the case of *Life Ins. Co.* v. *Terry,* in the Supreme Court

45

of the U. S. 15 Wall. 580, where. he says: "If the death is caused by the voluntary act of the deceased, he knowing and intending that his death shall be the result of his act, but when his reasoning powers are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable." This principle is recognized in *Esterbrooks* v. *Ins. Co.* 54 Me. 224; *Breasted* v. *Farmer's Loan and Trust Co.* 4 Hill (N. Y.) 73: 4 Selden, 299.

The judge, in his charge, tells the jury, that "if Hathaway had sufficient mind, reason, and judgment to rationally consider and determine whether he preferred to die or to live, and he, for any reason, determined that he preferred to die, and in pursuance of that determination, he, comprehending what he was doing, took his own life, the plaintiff would not be entitled to recover the amount insured." And in another part of the charge says to the jury, that "it was not enough, to entitle the plaintiff to recover, that at the time he took his life, his mind was unsound to some extent, nor that it was so unsound that he could not distinguish right from wrong, but that it must have been so unsound that it could be seen that the unsoundness killed him. But if his mind, reason, and judgment became impaired, and an insane idea that he must take his own life entered into his mind and got hold of it, and his mind, reason, and judgment grew weaker, and that idea stronger, until his mind was overthrown, and the idea got control of his reasoning faculties and of him, to that extent that he could not resist it, but was compelled to and did yield to it and take his life, so that, although his own mind contrived the means by which his life was taken, and his physical strength carried them out and took it — in reality this insane idea or impulse, and not his mind and will, took his life—the plaintiff was entitled to recover."

We think this charge is quite as favorable to the defendants as they have a right to ask, or as the law will allow under it. It is not enough for the jury to find that the mind of the deceased is so

impaired that he is incapable of distinguishing between right and wrong, but they must be satisfied that his mind was so overthrown that he had no power to resist the insane impulse to take his life, so that the act was the direct and immediate consequence and result of his insanity; in short, that the taking of his life was an insane act, in respect to which his reason was powerless.

The defendants in their 6th request, in effect ask the court to take the case from the jury, and direct a verdict for the defendants, on the ground that the letters of the deceased, as to the genuineness of which there was no dispute, were conclusive as to his sanity. The weight to be given to those letters, was a question for the jury, and not for the court. They were to be considered by the jury, in connection with all the other evidence in the case; and from the case as it is presented here, we think it would have been error for the court to have directed the jury that the letters were conclusive of the question.

Judgment affirmed.