MARY M. ROGERS *v.* STATE OF VERMONT.

May Term, 1905.

Present: ROWELL, C. J., TYLER, MUNSON, START, WATSON, HASELTON, and POWERS, JJ.

Opinion filed June 2, 1905.

*New Trial—Newly Discovered Evidence—Accomplice—Evidence—Opinions—Experts and Non-Experts—Medical Books—Criminal Law—Insanity—Hereditary Insanity.*

On a petition for a new trial, in behalf of a respondent who had been convicted of murder, based on newly discovered evidence, it ap-

peared that the State called as a witness a confessed accomplice who, after having been fully advised by the court concerning his rights and privileges, testified to all the details of the homicide and to the part which he and respondent had taken in it; that though, on cross-examination, he made contradictory statements and did not answer some questions, his testimony in chief was not materially changed or shaken, and in many of its material respects was so corroborated by other witnesses and circumstances as to render it certain beyond a reasonable doubt that he had told substantially the truth. *Held*, that the court is not warranted in saying that the statement of said accomplice to certain affiants that in his said testimony "he lied and had to do it to save his neck" referred to anything besides said contradictory statements.

The evidence given at the trial, which tended to show that the cause of the death of deceased was suffocation by means of chloroform, considered, and *held*, that the newly discovered evidence revealed by the affidavit of an undertaker who testified that, on preparing the body for burial, he found "a compound multiple depressed fracture of the skull" of the deceased is not of sufficient force to create any doubt in the minds of a jury as to the cause of death.

It is essential to the admissibility of the opinion of a non-expert witness as to sanity or insanity that he first state the observations he has made upon which he bases his opinion.

The opinions of experts are not to be received in evidence unless based upon facts testified to by themselves or by others.

Standing alone and unconnected with other actions and peculiarities, the facts that a girl, while attending school, was mentally weak, of a very nervous disposition and excitable temperament, and was the butt of ridicule of her schoolmates on account of her peculiarities in dress and adornment, have no tendency to show insanity. At most, these facts only show her to be more disposed to insanity than persons in general.

Evidence of hereditary insanity is cumulative evidence only, and not admissible until a foundation has been laid by the introduction of evidence of insanity in the person whose mental condition is in issue.

Statements from medical books on insanity are not evidence; for they are made without the sanction of an oath, and by persons not present and not liable to cross-examination.

To avoid responsibility for a criminal act on the ground of insanity it is not enough that the mind is so impaired that it is incapable of distinguishing right from wrong. The mind must be so over-

come that it has no power to resist the insane impulse to commit the deed.

On a petition for a new trial in behalf of a respondent convicted of murder, based upon newly discovered evidence of, among other things, her insanity, all the evidence examined and *held*, that there is no reasonable doubt that the petitioner at the time of the homicide had the mental ability to distinguish right from wrong, to fully comprehend the nature of the act she was about to commit, and that she had sufficient will power to enable her to refrain from committing the crime.

PETITION for a new trial brought, under V. S. 1997 and 1998, by a respondent after her conviction of murder, to the Supreme Court for Bennington County, at its May Term, 1905, and heard at said term.

*Thomas W. Moloney* and *Senter & Senter* for the petitioner.

Where the conviction of a defendant rests largely upon the evidence of one witness who afterwards admits that he perjured himself at the trial, and tells an entirely different story concerning the transaction, yet implicating the respondent and giving a different version of his connection with it, on a proper showing it is sufficient cause for a new trial. Such evidence is more than cumulative or impeaching. *Dennis* v. *State,* 103 Ind. 142; 7 Crim. Law Mag., 172; *Fletcher* v. *People,* 117 Ill. 184; *Casey* v. *State,* 8 Crim. Law Mag., 612; *Peagram* v. *King,* 11 Am. Dec. 793.

Newly discovered evidence, although impeaching, if it shows that the respondent was convicted upon false testimony, is good ground for a new trial. This ought to be more especially true in a case involving a human life. *State* v. *Murray,* (Mo.) 3 S. W. 400; *Lincicum* v. *State,* (Tex.) 25 Am. St. R. 729; *Chatfield* v. *Lathrop,* 6 Pick. 415; *Bailey* v. *State,*

(Neb.) 55 N. W. 241; *State* v. *Moberly,* (Mo.) 26 S. W. 366; *Bowman* v. *State,* (Ga.) 22 S. W. 275.

*Clarke C. Fitts,* Attorney General, and *William R. Daley,* State's Attorney for the State.

Evidence of hereditary insanity in the ancestors of a person accused of a crime is not sufficient to relieve of criminal responsibility in the absence of actual insanity in the accused. *State* v. *Windsor,* 5 Harr. (Del.) 512; *Baxter* v. *Abbott,* 7 Gray 71; *People* v. *Garbutt,* 17 Mich. 9; *Walsh* v. *People,* 88 N. Y. 458; *State* v. *Hoyt,* 47 Conn. 518; *People* v. *Pine,* 2 Barb. 566; *Bradley* v. *State,* 31 Ind. 492; *State* v. *Felter,* 25 Iowa 67; Lawson on Insanity, 864.

If the petitioner had sufficient mental capacity to distinguish between right and wrong at the time of committing the act, she is responsible. *People* v. *Hurtado,* 63 Cal. 288; *State* v. *Nixon,* 32 Kan. 205; *Guissom* v. *State,* 62 Miss. 167; *State* v. *Harrison,* 36 W. Va. 729; *U. S.* v. *Ridgeway,* 31 Fed. Rep. 144; *State* v. *Lawrence,* 57 Me. 574; *People* v. *Taylor,* 138 N. Y. 398; *Flanagan* v. *People,* 52 N. Y. 467; *Casey* v. *People,* 31 Hun. 158; *People* v. *Carpenter,* 102 N. Y. 238; *DeJarnetti* v. *Com.,* 75 Va. 876.

WATSON, J. The petitioner, Mary M. Rogers, seeks a new trial on the ground of newly discovered evidence.

At the June term, 1903, of Bennington County Court she was indicted for murder, charged with the killing of her husband, Marcus Rogers, at Bennington on August 12, 1902. At the December term, 1903, she was tried and convicted of murder in the first degree. Judgment was rendered on the verdict, and sentence was imposed according to law.

At the trial Leon Perham of Bennington, a confessed accomplice, was called as a witness by the State and, after being

advised fully by the court concerning his rightss and privileges under the law as to giving evidence which would tend to incriminate himself and that if he gave such evidence it might be used against him in any trial he might have growing out of the matter, gave testimony in substance that he was 19 years of age and first became acquainted with the petitioner when she came to the house of his parents to room and board about two years before the time of the trial; that Marcus Rogers came there when the petitioner was rooming and boarding there, which was the first time the witness ever saw him; that about a week before the homicide the petitioner spoke to the witness saying that she wanted him to "hire a rig and go to Hoosick Corners" with her to make a date, that "this fellow has a life insurance of $1,000," and she wanted to get rid of him to get the insurance money; that she wanted to make a date with him to be on such a night beside the river, and she said to the witness, "get him beside the river" and "you drop off, you drive off in the road," and that she would "do the rest"; that she then said she was going to knock him in the head and further said, "after I roll him off into the river you drive back,"—that she would let the witness know,—and she would jump into the wagon and they would whip up the horse, "and get out of the place and get back"; that nothing came of this; that in the afternoon of the day of the homicide, the witness saw Marcus Rogers and the petitioner and one Estella Bates at the house in Bennington where the latter lived; that the witness remained there until half past five o'clock and then went to his home, Marcus and the petitioner coming down behind him, and after the witness got home the petitioner came, it being then about half past six o'clock; that the witness went to bed that night at half past eight and the petitioner about nine; that the witness laid down on the bed and went to sleep and was awakened about

half past nine by the petitioner who asked him "are you ready to go," to which the witness answered, "yes," the petitioner said, "you wake up and get ready," the witness said "all right," but did not get up immediately. About half past ten the petitioner called him again to get up and put on his clothes and upon the witness's saying "all right" she went out of the room and sat down and went to writing; that the witness's bed room and the petitioner's bed room adjoined, and to go to the witness's room it was necessary to pass through the petitioner's room; that as the witness was getting ready to go out the petitioner called for his jackknife and he let her take it; that she sat down on the bed, took a two ounce bottle of chloroform out of her bosom and with the jackknife cut the label off, saying to the witness that Estella Bates bought the chloroform at Hoosick Falls; that as the petitioner and the witness started to go out, the petitioner directed the witness to take off his shoes and at the same time she took off hers, and in that way they passed down stairs and out of doors; that after going out they put on their shoes, waited some minutes, and then went through the fence following the path into Morgan's Grove, the petitioner taking the lead and the witness following her; that they went down to the stone wall by the river bank; that after waiting about half an hour for Marcus Rogers, who did not come, the petitioner went to see if she could find him, and when she came back he was with her; that the petitioner said to Marcus, "sit down on the wall," whereupon he sat down and they went to talking about how he was getting along, what he was doing, where he was working, and how his health was; that she said to Marcus, "Let's sit down on the ground beside the wall, it is warmer," and asked the witness for his overcoat; that she took the overcoat, laid it down lengthways of the wall and all three sat down, Marcus being between the witness and the petitioner;

that the petitioner then said to Marcus, "You get up, this does not sit right," whereupon he got up and she took the overcoat, spread it on the ground and Marcus sat down, laid his head in her lap, and they went to talking about the same things as before; that the petitioner then said to Marcus, "Estella Bates showed me some tricks today with a rope," and at the same time she asked the witness to take the rope which they had brought with them; that the petitioner took the rope, asked Marcus for his hands, and she tied them behind him; that the first time she tied them he got them apart, she tied them a second time, he took them apart again, whereupon she asked the witness to take the rope and try it, which he did with like result the first time, but as the witness was tying the rope the second time Marcus said to the petitioner, "what are you doing"? she said, "nothing"; that in the meantime the petitioner had taken out the chloroform bottle, and the witness kept on tying the rope; that she turned the chloroform onto some handkerchiefs, tipped Marcus over with his head in her lap and put the handkerchiefs under his nose; that Marcus then turned over and said "stop it," but she kept on, calling to the witness for help; that the witness helped hold Marcus, who, in about two minutes, was dead; that by direction of the petitioner the witness cut the rope off Marcus's hands and rolled him into the river; that as he was rolling him in, the petitioner took from Marcus's pockets his insurance papers; that the rope thus used the witness took with him from his father's place by the petitioner's direction, the petitioner then telling the witness the use she wanted to make of it; that after the body was rolled into the river the petitioner carried the chloroform bottle back with her, and the rope she threw into the back yard of the witness's father's house; that the petitioner wound the handkerchiefs which had been used in chloroforming Marcus, around the chloroform bottle and wrapped them in paper

and directed the witness to throw them under the water closet, which he did; that the petitioner pinned a note written by her upon Marcus's hat and tied the hat to a bough of a tree some distance away from the place of the homicide and near the path in Morgan's Grove; that the witness and the petitioner got back to the house at half past twelve o'clock and went to bed; that after the body was found the witness confessed the crime, showed Deputy Sheriff Nash where the chloroform bottle was, also the rope, and assisted him in getting the bottle with the handkerchiefs and paper tied around it from under the water closet, also went with him and pointed out the route that he and the petitioner took on the evening of the homicide in going to the place where the crime was committed; that on the night of the homicide the petitioner told the witness that the man killed was her husband, that she wanted the insurance money to buy furniture to go to keeping house; that she was going to keeping house with Morris Knapp who had also been boarding at the witness' father's house, and when there had occupied the same room and bed with the petitioner; that during the week of the homicide Morris Knapp was in attendance upon the muster of the state militia of which he was a member, at Burlington.

The witness was cross-examined at length by the petitioner's counsel and in some respects made contradictory statements, and some questions he did not answer; but regarding the particulars of the homicide and the part which he and the petitioner respectively took in the same, his testimony in chief was not materially changed or shaken. The witness testified in cross-examination that when he first confessed the crime he was scared, also that he had been informed by his brother Levi that the state's attorney and his assistant, Mr. Barber, had said that if the witness would go on the stand and testify to the truth he would be let off upon a charge of man-

slaughter and he would not get more than three or four years' imprisonment, and that it was under such promise, representations, and hope that he had testified.

Attached to the petition for a new trial are the affidavits of William S. Lovell, E. W. Oakes, and Edward B. Flynn who were together at the State prison at Windsor on the 31st day of January last. These affiants testify that Leon Perham then told them that when he testified against the petitioner at her trial he lied and had to do it in order to save his own neck, or as one of them puts it to save himself, and upon this statement as shown by these three affidavits the petitioner relies as one ground for a new trial. So far as these affidavits show, all Leon then said to the affiants was that he had lied when he testified at the trial. In what respect he lied he did not state. It may have been regarding some of the particular things concerning which he gave contradictory statements in his cross-examination as above stated. It appearing by the transcript of the evidence given at the trial that he did so contradict himself, the Court is not warranted in saying that his statement to the affiants had reference to anything else. The matter of these contradictions was before the jury for consideration in determining how much weight they would give his testimony. It is argued by the petitioner's counsel that his statement to these affiants is of much force because of his testimony at the trial that he had been promised immunity by reason of which he gave his testimony. But this was also a matter for the jury to take into consideration, and that it might not be overlooked, in the charge to the jury their attention was particularly called thereto and they were instructed that while it was not claimed on the part of the respondent that any one in the authority of the State had held out any inducement to Leon to testify, and that the State was not responsible for what any one else had done,

yet, if his mind was affected by what some one else had told him in that regard they should consider it and say whether that fact in any way colored the testimony which he had given in court. In addition to this the testimony given by him at the trial in very many of its material respects was so corroborated by other witnesses and circumstances as to render it certain beyond a reasonable doubt that he had told substantially the truth. Under such circumstances these three affidavits have no material force as a basis for a new trial.

The evidence on the trial tended to show that the cause cf the death of Marcus Rogers was asphyxiation or suffocation caused by the shutting of the glottis upon the holding of handkerchiefs saturated with chloroform to his nose.

Attached to the petition is the affidavit of Louis Z. Haussler, an undertaker and funeral director in the village of Hoosick Falls, state of New York. The affiant states that on or about the 13th day of August, 1902, he was employed by one William H. Rogers to prepare for burial the body of his brother Marcus Rogers; that while he was engaged in so doing at the residence of the said William in Hoosick, the affiant discovered "a compound multiple depressed fracture of the skull on the back upper side of the skull just over the ear," which fracture he says was not made after the body came into his charge for burial. It is argued for the petitioner that this evidence tends to show that the death of Marcus Rogers may have been due to a blow which caused this fracture and not to asphyxiation, also that the blow causing this fracture must have been given by Leon Perham, and that this is the respect in which he lied in giving his testimony, and is what he referred to in making the statement he did to the affiants Lovell, Oakes, and Flynn. But the Court cannot conjecture that he had reference to this or any other particular thing upon the naked statement to them that he lied. More-

over, the evidence at the trial shows that the autopsy on the body of Marcus Rogers was performed by Dr. E. B. Daley and Dr. H. J. Potter of Bennington on the day the body was taken from the river and the day following. In their testimony they were asked to state fully what they did and what they observed in performing the autopsy. So far as is material to this question their testimony was, in substance, that the clothing was wholly removed from the body; that they made an inspection of the body and on the face there were some marks like punctures or scratches, upon the left ear there was a cut, and over the right eyebrow there was a slight and insignificant looking bruise; that the skin over a portion of this bruise was slightly broken, maybe a quarter of an inch and not over half an inch; that they removed the brain from the skull and in so doing they inspected the underside of the bruise over the right eye. By such an inspection that bruise was found to be somewhat more extensive under the skin than appeared externally. The brain was found to be in a normal condition. The lungs and heart were removed and inspected, and evidence was given particularly concerning these organs and their conditon. Wet sawdust and sand were found in the clothing, in the hair, in the mustache, in the hollow of the ears, in the mouth, and about the teeth. The glottis was found closed and no foreign substance of any kind was found below it. Not only do neither of these physicians testify to finding a fracture such as is described by the affiant Haussler, but Dr. Potter, after describing what they did find as above stated, expressly says he thinks that was all the scars or marks they found on the body. It is inconceivable how such a fracture could have then been upon the body and these doctors, performing the autopsy as they did, not discover it. Further, the chloroform bottle having a few drops of chloroform in it with the two handkerchiefs wound around

it wrapped in a paper, was found under the water closet where Leon Perham testified that he put it, and when thus found it had the smell of chloroform.   Dr. Daley in testifying was asked the question: "Suppose a handkerchief were saturated with chloroform, with a considerable quantity of it, and that the handkerchief so saturated was applied with force and held to the subject's nose and mouth and retained there for some time, two or three minutes, what would you expect would naturally follow from that application of the chloroform?"

It will be noticed that this hypothetical question is based upon the evidence as given by Leon Perham in describing how the crime was committed.   The Doctor answered: "I should expect, it would produce a spasm of the glottis, the glottis would shut tight, and held for two or three minutes there in that manner, that operation, that proceeding, would cause death by asphyxia or smothering."   The witness further testified that in his opinion death was caused by asphyxiation produced by chloroform applied in that way.   Doctors Potter and Wiltse gave their opinion to the same effect.   In addition to this, Leon Perham in his cross-examination expressly states that neither he nor the petitioner struck Marcus Rogers any blows at the time of the homicide.   In view of the evidence given at the trial in this respect, we do not think the testimony of the affiant Haussler is of sufficient force to create any doubt in the minds of a jury upon the question of the cause of death.

The only other ground upon which the petition is based is that of the mental condition of the petitioner when the crime was committed.   The other affidavits attached to the petition bear upon that question, and it is argued that they tend to show that the petitioner was then insane and not responsible for her acts, or at least that they are sufficient to reduce the degree of the crime found.

The affiant Mary A. Hayes, a resident of the village of Hoosick Falls, testifies that during the years 1893 and 1894 she well knew the petitioner and attended school with her in that village; that the affiant distinctly remembers that the petitioner was the butt of ridicule of nearly all the students then attending school on account of the many peculiarities which the petitioner possessed. "One particular peculiarity being the decorating of her hair and clothing with ribbons and bows of many and varigated colors, on account of which she presented a fantastic appearance which drew upon her the ridicule of her schoolmates and the sobriquet of 'the mope' from them, by which she was generally known by all her schoolmates." The affiant further says that the petitioner was backward in her studies, was of low intelligence and very weak mentally. The affiant Helen F. Corcoran of the same village testifies to her attending school with the petitioner during the years 1894 and 1895. In most respects her affidavit is like that of Mary A. Hayes and largely in the same words, the only difference being that in the latter nothing is said in regard to the "sobriquet," but it states that the petitioner apparently took much pride in the ridicule of her schoolmates, which is not in the former. The affiant Charles W. Corcoran testifies that the petitioner worked for his mother as a domestic for several months during the year 1897; that for several years prior thereto he knew the petitioner, having frequently met her while in attendance at school at Hoosick Falls, and that she "was the subject of much ridicule from her schoolmates because of her foolish actions," and "because she appeared" to the affiant "as a child with a weak mind." That while petitioner worked for the affiant's mother he had some opportunities to observe the petitioner, her conduct, and actions and knew her to be "an impulsive, emotional person of very nervous disposition and excitable temperament, a person

of very low intelligence and mentally weak." The affiant William Stinton testifies that the petitioner worked for him as a domestic several months during the year 1897, and that he had much opportunity to study her "peculiarities and characteristics;" that while her outward appearance "was that of an ordinary intelligent person," affiant knew her "to be a person of very low intelligence, possessed of a very nervous disposition, excitable temperament," and "very weak mentally." The affiant Teresa Smith testifies that she has been intimately acquainted with the petitioner since her early childhood; that she frequently noticed that the petitioner acted strangely and she does not believe that the petitioner was at all times sound mentally; that the petitioner was a person of low intelligence and was known to the affiant as a person at all times weak mentally.

These five affidavits are in substance the same regarding the petitioner's low order of intelligence, but this fact neither shows nor tends to show insanity. Three of the affidavits tend to show the petitioner's peculiarities while attending school, and two of them that she was in the habit of decorating her clothing with ribbons of various hues and colors, thereby creating a "fantastic appearance," and that she was the butt of ridicule of the other scholars. These peculiarities of the petitioner and the ridicule of her schoolmates may easily be accounted for by the degree of her intelligence. The fact that a girl wears ribbons of various hues and colors has no more tendency to show insanity than do the same characteristics in females of mature years, who take pleasure in adorning themselves in different colors or in a manner more striking to the eye, which attracts attention, or in a boy by the various neckties of bright colors, which he wears when in his teens.

Standing alone these facts have no tendency to show insanity. It is only when they are closely connected or combined with other actions or peculiarities that they can have such a tendency. No connections or combinations are disclosed to give them such character, hence as evidence, at most they can only show the petitioner possessed of such mental peculiarities as to render her more predisposed to insanity than persons in general. *Willis* v. *People,* 32 N. Y., 715. The statement of the affiant Teresa Smith that she frequently noticed that the petitioner acted strangely and the affiant did not believe she was at all times sound mentally is of no force, for non-experts in testifying to sanity or insanity must first state what they have observed upon which they base their opinion. Such a basis is essential to the admissibility of the evidence. *Foster's Exr's* v. *Dickerson,* 64 Vt., 233.

The affiant Leroy D. McWayne, a resident of the village of Hoosick Falls, testifies that he has been a practicing physician for thirty years, and for twenty years last past in that village; that he is acquainted with the petitioner, having on many occasions for several years treated and prescribed medicine for her professionally previous to August 12, 1902; that the affiant was well acquainted with Marcus Rogers, the husband of the petitioner; that on or about August 7, 1902, Marcus Rogers called at the office of the affiant and asked him if the petitioner had been calling to consult him professionally, and upon being answered in the affirmative, Marcus informed the affiant that he expected she would soon call again, and he then requested the affiant not to treat her nor to give her any medicine or any other drugs she might call for; that Marcus then said the reason he made the request was that the petitioner had of late been acting strangely, he did not believe she was of sound mind, and he feared if she obtained any dangerous medicines

or drugs she might do herself or some one else bodily injury; that on Sunday, August 10, 1902, a few days after Marcus was at the affiant's office, the petitioner called again and demanded that he should prescribe for her certain drugs and medicines which he knew to be dangerous; that the affiant then observed that the petitioner was in a highly nervous mental state and refused to prescribe for her or to furnish her with the drugs and medicines desired; that the petitioner thereupon flew into a violent passion, soundly berated the affiant for refusing her request, and threatened to kill him if he didn't prescribe for her as she requested; that the affiant then tried to reason with and calm her, and after calling for assistance and using much persuasion induced her to leave his private office and go into his reception room, where he had a long conversation with her and where, in the presence of his wife, he examined the petitioner as to her sanity and mental state; that after a careful examination of the petitioner the affiant determined that she was then suffering with puerperal insanity; that on said Sunday, August 10, the petitioner was temporarily insane, caused as the affiant believes by pregnancy, in which condition she was at that time.

The only force which can be given to this affidavit as to what Marcus said is, that it served to call the affiant's attention to the condition of the petitioner; other than that it is hearsay and cannot be considered. The affiant testifies that the petitioner called at his office on the date named and demanded that he should prescribe for her certain drugs and medicines which he knew to be dangerous, and he observed that she was in a highly nervous state of mind and flew into a passion and threatened to kill him if he did not prescribe for her as requested. Other than this he testifies to nothing that she did or said while there as a basis of his opinion that she was then temporarily insane, nor does he state what he

did by way of examination, nor upon what he bases his opinion that she was suffering from puerperal insanity. We recognize the rule that the opinions of experts are not to be received as evidence unless based upon facts testified to by themselves or by others, as laid down in *Wetherbee's Exr's* v. *Wetherbee's Heirs*, 38 Vt., 454, and in *Foster's Exr's* v. *Dickerson*, before cited, however we are not disposed to apply it in this case and the petitioner will be given the full benefit of Dr. McWayne's testimony.

We are satisfied from the evidence introduced at the trial, however, that the affiant is mistaken as to the day when the petitioner was at his office—that it was not on the 10th day of August but must have been earlier. We assume that it was near that day and so treat it.

The affiant Jane Smith testifies that for many years she resided in the town of Hoosick as a neighbor of Charles Bennett, the father of the petitioner; that at the time of the birth of the petitioner the affiant was in attendance upon the petitioner's mother, Johanna Bennett, and assisted in nursing her during confinement and helped care for her sometime after the birth of the child; that during the time she was thus in attendance upon the mother, Charles Bennett acted strangely and violently at times and apparently had an insane desire to do injury to his wife while she was in bed; that he frequently exclaimed in a loud manner and while in a violent temper that he would kill the mother and that if a child were born to him he would kill it; that during all this time the wife was in great fear that her husband would do her great bodily injury; that a few days after the birth of the child the affiant heard the mother calling for aid, saying that the father was trying to kill the child; that the affiant then hastened into the bedroom in which lay the mother and child and there found the father trying to kill the child by smothering it with the bed

clothes which he was holding tightly over the face of the child; that the affiant with the aid of others forced him from the room; that for several years before and after the birth of the petitioner the affiant frequently met and well knew the father; that he was addicted to the use of alcoholic liquors and "was of a low depraved mentality and was weak intellectually;" that he frequently and at the slightest provocation flew into a violent passion and at such times acted in an insane manner toward his wife and others; and that he was a degenerate, and his actions were those of a person of unsound mind and the affiant believes that he "was a victim of moral insanity."

The affiant William Brant, a resident of the village of Hoosick, testifies that he has known the petitioner since her birth, and that he well knew her father, Charles Bennett, and her mother, Johanna Bennett; that the mother is a woman of "very low intelligence and mentally weak;" that the father was addicted to the excessive use of alcoholic liquors and while in an intoxicated condition and frequently at other times acted in a violent and abusive manner towards his family and treated them most inhumanly; that he "possessed a low depraved nature, was mentally weak, and was a moral degenerate;" that the affiant is informed and believes that Charles Bennett upon several occasions after the birth of his child attempted to take her life; that he knew the petitioner from infancy until she grew to womanhood and frequently observed that she had many of the characteristics of her father and mother; that as a child she was "possessed at times of an ungovernable temper, impulsive, and apparently incapable of acting and behaving like other people;" that she "was of very low intelligence and of a nervous disposition, excitable temperament, and a person very weak mentally." So much of

this affiant's testimony as is on information and belief is but hearsay and will not be considered.

The affiant Johanna Callahan, the mother of the petitioner, testifies that Charles Bennett, now deceased, was her husband and the father of the petitioner; that during all the time she lived with him and from the date of their marriage he was addicted to the use of alcoholic liquors and frequently came home beastly intoxicated and would severely beat, wound, and ill-treat the affiant and demand whatever money she had saved from her labors that he might obtain more liquor; that he would frequently be taken with a fit of violent anger and at such times seem to be possessed with an uncontrollable and morbid impulse to do the affiant or some other person violent injury, and at such times seemed to be without will or reason; that he "was illiterate, was possessed of a low depraved nature, was morally a degenerate and was mentally weak;" that for some time previous to the birth of the petitioner said Charles "became more venomous and insane in his actions toward" the affiant, frequently in a violent passion threatening to kill the affiant before her child should be born, saying that he would surely kill the child as soon as it was born; that on account of the violent and insane actions of the husband, the affiant was constantly in fear of her life; that a few hours before the birth of the child the husband in one of his insane moods and fits of violent passion and while the affiant was seriously ill in bed came into her room, barricaded the door from the inside, and threatened to kill her; that a few days after the birth of the child and while affiant was yet in bed with her new born babe, he came into the room where they were, saying that he intended to kill the infant, and made an effort so to do by smothering it with the bed clothes which he held tightly over its head and face; that the affiant was unable to offer any resistance but called loudly for help, and that help

came and "ejected" him from the room; that thereafter her
husband went away from home and she did not see him
again for several months; that when the petitioner was about
six months old the affiant and her husband with their child,
the petitioner, went to Utica, N. Y., and when in their room
at the hotel there he made several attempts to kill the child by
poisoning her with laudanum, and in one of these attempts
nearly succeeded; that the affiant noticed him giving the
laudanum to the child, "and noticing that the child was in
distress immediately obtained the services of a physician who
after several hours' labor resuscitated the child and saved her
life."

The testimony of these three affiants fairly considered
tends to show that Charles Bennett was a man of a low de-
praved nature, mentally weak, of a violent temper, and that
he at times severely beat, wounded, and ill-treated his wife,
and threatened to kill her and the child when born, and on
one occasion attempted to smother the child, and on others to
poison it with laudanum; also that during all the time cov-
ered by their testimony he was addicted to the excessive use
of alcoholic liquors and frequently came home beastly intoxi-
cated. The fair inference from this testimony is that his
violent actions and threats shown were largely if not wholly
when he was under the influence of intoxicating liquor. The
testimony of the petitioner's mother bearing upon this point
is hardly susceptible to any other construction.

The affiant Jane Smith says that he apparently had an
insane desire to do injury to his wife while she was in bed,
that he frequently and at the slightest provocation flew into
a violent passion at which times he acted in an insane manner
towards his wife and friends, and that "his actions were those
of a person of unsound mind," and the affiant believes that he
was a "victim of moral insanity;" and the affiant Johanna

Callahan speaks of his "insane actions" and "insane moods."
Other than this there is nothing in the affidavits given by the
last three affiants named tending to show insanity, except what
may be inferred from the actions described which, as has
been seen, were to a large extent if not wholly when the said
Charles was more or less intoxicated.

It appears from the evidence attached to the petition
that Patrick Dwyer, a brother of the petitioner's mother, was
declared insane on the 20th day of April, 1886, and com-
mitted to the Hudson River State Hospital at Poughkeepsie,
N. Y., on the same day as an insane person, where he re-
mained until the 4th day of August following, when he was
discharged as improved, and that he was suffering from a
form of insanity "known as acute melancholia with suicidal
tendencies." The affiant Barney Smith testifies that on or
about the 17th day of March, 1886, the said Patrick Dwyer,
as the affiant is informed and believes, while the said Patrick
was temporarily insane, attempted suicide by cutting his
throat, and that thereafter the affiant assisted in watching and
attending him at his home. The evidence given by the affiant
upon information and belief of the attempted suicide can have
no force as it is only hearsay, but the fact that he assisted in
watching and attending Patrick was a matter within his own
knowledge concerning which he can give testimony.

Whether any insanity which the evidence tends to show
that the petitioner's father had, or the insanity of her uncle
Patrick Dwyer, can legally be considered as transmissible
without evidence tending so to show as a fact, we have neither
considered nor determined. For all purposes here we shall
assume that in each case it was of a type transmissible. Proof
of hereditary insanity, however, is cumulative evidence only,
and it is not admissible until a foundation has been laid by
the introduction of evidence of insanity in the person whose

mental condition is in issue. *State* v. *Van Tassel*, 103 Ia. 11; *Laros* v. *Commonwealth*, 84 Pa. St., 200; *State* v. *Cunningham*, 72 N. C., 469.

Counsel for the petitioner have quoted in their brief largely from medical books on insanity, but such books are not evidence; for they are statements without the sanction of an oath and made by persons not present and not liable to cross-examination. *Ashworth* v. *Kittredge*, 12 Cush. 193, 59 Am. Dec. 178; *Huffman* v. *Click*, 77 N. C. 55; *People* v. *Hall*, 48 Mich. 482, 42 Am. Rep. 477; *Tucker* v. *Donald*, 60 Miss. 460, 45 Am. Rep. 416.

The question then is whether the newly discovered evidence tending to show insanity of the petitioner at the time of the homicide is of such force as reasonably to warrant the belief that a new trial would result in a different verdict. Upon this question it becomes necessary to examine with care further the evidence given at the trial.

The petitioner was born March 9, 1883. Marcus Rogers and the petitioner were married December 18, 1898. In the following spring they went to keeping house in Shaftsbury and continued to keep house there and at other places until January 7, 1902, when they broke up housekeeping at Hoosick, and she went to Bennington and he went to work for William Rogers, his brother, in Hoosick where he remained and continued to work until his death. The petitioner henceforth roomed and boarded in Bennington until after the homicide. During the time while they were thus living apart she was at William Rogers's six or seven times, the last of which was in July, and on two or three occasions in the winter and spring she remained there over night, and on one occasion for two nights and a part of three days. Marcus also saw her at Bennington on different occasions within the same period of time.

Several witnesses testified at the trial that previous to the homicide the petitioner told them severally that her husband had tried to get her to go to Hoosick to keep house with him and that she would not go. Several witnesses testified to hearing him ask her to go home with him for that purpose and that she refused; several witnesses testified to seeing the petitioner and her husband together on Cooper's bridge about six o'clock in the evening of the homicide, and several, that she told them after the homicide and before the body was discovered that she last saw him about six o'clock on that afternoon, and expected to meet him again that evening but did not.

One witness, the insurance agent, testified that he talked with her about the insurance upon her husband's life as early as in the last part of July on two different occasions and told her that she was the beneficiary named in the policy. Two or three other witnesses testified that before the homicide she told them severally regarding the insurance upon her husband's life, and one, that it was made out in her name. In talking with Morris Knapp, Leon Perham, and Levi Perham severally before the homicide, she spoke about having the insurance money with which to buy furniture to go to housekeeping, and the last named witness testified that on the Sunday night next before the homicide she tried to arrange with him to get a rig and take her to Hoosick Falls the next day to murder her husband, in substantially the same way as it was later done; that she then said she had the chloroform. That the witness asked her why she wanted to do it, and she said that he had some insurance and he owned a little place or property which was in her name and she wanted it, to go to keeping house with Morris Knapp.

Three witnesses testified that Marcus Rogers came to the house of his sister, Mrs. Francis Phillputt, off Beach street in

Bennington, between half past six and seven o'clock that night, ate supper there, and went away between eight o'clock and half past the same evening; that while there he took his insurance book and the envelope containing the same out of the inside pocket of his coat, showed the book to the witnesses, talked about it, put it back into the envelope and then put them into his pocket again, and thus carried them off with him; that when he went away he left his umbrella and a bottle of medicine at the Phillputt house. The testimony of Leon Perham was that the petitioner took these insurance papers out of Marcus Rogers's pocket after he was dead and when his body was being rolled into the river. Two witnesses testify that in the afternoon of the day following the homicide the petitioner went to Mrs. Phillputt's house; that nearly the first thing said to her when she got there was that Mrs. Phillputt asked her what she had done with "Mark," to which the petitioner answered that she had not seen him since the evening before, about half past six, on Cooper's bridge, and said she felt worried about him and asked if he had been there; that she said she and her husband had a quarrel and he said she would never look on his face alive again, and when asked what the quarrel was about she said he wanted her to live with him, that he wanted her to go to housekeeping with him and she would not do it, and that he threw his insurance book into her lap; that she asked the witnesses if they thought it necessary to call out the fire alarm to find him, and was told they didn't think it was necessary; that she said she felt as if something had happened to him and she felt as if he had drowned himself; that the witnesses told her to hire a team and go out to his brother's to which she said she didn't want to and further said that he would not go home and leave his umbrella and medicine there. The witnesses further testified that up to that time nothing had been said about the umbrella or

medicine by the petitioner or in her hearing, and that neither
the umbrella nor medicine were within sight of the petitioner,
except that not quite all of the lower half of the umbrella could
be seen where it was hanging in the corner of the room under
a jacket.

The insurance agent before referred to testified that
when the petitioner called at his office at his request on the
day of the inquest she had the insurance book and envelope in
her possession.

The state muster was from August 7 to August 13 in-
clusive. Knapp testified that in July he and the petitioner
had a talk about getting married and that just before he went
to muster she spoke to him about getting furniture of Charles
Potter, a furniture dealer in Bennington. What took place
between the petitioner and Potter, and the mental condition
of the petitioner at that time, may best be understood from
Potter's testimony given here in detail:

"Q. 5. In August, 1902, did you see the respondent, Mrs.
Rogers? A. I did.

Q. 6. And where? A. In my store.

Q. 7. Where was your store then? A. On Main
street, the north side of Main street.

Q. 8. And this side of Cooper's bridge? A. Yes sir.

Q. 9. Was it about half way between Cooper's bridge
and the Putnam house? A. I should think it was just about.

Q. 10. You say you saw her at your store. Now did
you know her by sight before that? A. I never had seen
her until she was in my store.

Q. 11. Can you tell about what time of the month it
was when she first came into your store? A. It was either
two or three days before the Guards went to muster.

Q. 12. When you say the Guards, you mean the com-
pany of militia here or the Bennington Rifles? A. Yes sir.

Q. 13. Did she tell you what she came there for? A. Yes sir.

Q. 15. Now you may state what she said about this furniture when she first came there, state the whole conversation you had about it. A. The first time I met the woman she came into the store and said she wanted to look over furniture and we looked over the different things in the store and then she decided upon a chamber suit.

Q. 16. You say she decided upon a chamber suit, what other talk did you have with her at that time. Did you ask her anything? A. Yes sir, I asked her her name.

Q. 17. Did she tell you? A. She said it was Rogers.

Q. 18. Did you ask her anything else? A. Yes sir, I asked her if she was going to get married.

Q. 19. What did she say? 'A. She said she intended to.

Q. 20. Did you ask her anything else? A. Yes sir.

Q. 21. What? A. I asked her whom she was going to marry.

Q. 22. What did she say? A. She said she didn't know as she cared to tell me.

Q. 23. Without my asking you, did you ask her anything else either time, go right on and state all the conversation at that time, I wish you would? A. She said she was intending to be married and she wanted to see about furniture and I then asked her whom she was going to marry, and she said she was going to marry a young fellow in town who was a painter but she didn't care to give any names, she said that she didn't like to have folks pry into her business. I told her of course the reason why I wanted to know was because I wanted to know whom I was trusting for the goods. Then I told her if the young man didn't care to be known himself that at night time to have her and him come into the store and

look over things and if she didn't care to reveal his name, I would know by that who the party was. I should say three days from that time she came back again, and she said that the young man knew me, that he was earning good wages but he had gone to the muster and everything was left with her and she wanted to pay me at the time he got back from muster $10.00 for the suit and the other things she would not purchase at that time.

Q. 24. In addition to the chamber suit did she look at any other housekeeping or household furniture when she was first there? A. She did, yes sir.

Q. 25. You may state what she looked at, in a general way? A. She selected nothing for certain but the chamber suit, but the other goods she looked at and talked about were tables and chairs, etc. She just went through my stock looking over my goods.

Q. 26. Whether or not she inquired the prices of the various articles she looked at? A. She certainly did, because I gave her the prices of the different goods as we were looking them over.

Q. 27. Now you have told about her coming to the store twice, do you remember whether she came there more than twice? A. I am quite sure all her calls at the store are three times, to the best of my memory.

Q. 28. Have you told us what transpired the third time? A. Nothing more than coming in to see if I was keeping the goods and have a talk about them.

Q. 29. Nothing especial then in addition to what you have already testified? A. No sir.

Q. 30. Did she say anything to you as to when she intended to be married or intended to go to housekeeping? A. She did not.

Q. 31. Now did she say anything further with reference to the matter of payments, you have already told about that, that she wanted to pay ten dollars down, now at any other time did she say anything further about payments? A. Yes sir.

Q. 32. When was that? A. That was the second time when she came into the store.

Q. 33. What did she say then? A. Why, she wanted to know how much time I could give on the balance of the furniture and I told her I would give her a reasonable length of time, and she wanted to know what I considered a reasonable length of time and I told her from thirty to sixty days, anything that was reasonable I was willing to give her. She said of course if she didn't need the balance—of course ten dollars that she paid, I could keep that, it was a matter of placing so much in my hands with the expectation of paying the balance in a reasonable length of time.

Q. 34. Is that all you think of that she said with reference to the method of payment or the amount of payment? A. It is, yes sir.

Q. 35. Whether or not anything was said by her to you about the lumping? A. It was to be paid in a lump. She said, "If you get your pay in a lump within a reasonable length of time that is all you need to know about this," or words to that effect. I would not say those were the exact words.

Q. 36. But that is as near as you can remember? A. Yes sir.

Q. 37. She didn't say anything to you at any time as to what the man she was going to marry had said to her about the purchase of the furniture? A. No sir, not a word, only I was to have my ten dollars when he got back from the muster."

After the body was found it was taken to the Perham house. One of the selectmen who then had the body in charge testified at the trial that when it was taken to the Perham house he saw the petitioner there. He was asked to state what talk he had with her and answered:

"I told her I had brought the body of her husband and she said she was only a boarder there and she could not very well care for it and asked if the town would not bury it. I said 'No', the town would not bury it, the proper place to take it was to her and let her take care of it. In the course of the conversation she wanted me to take it to his aunt's, Mrs. Phillputt's, and I refused to do that. Then she suggested I take it to his brother's in Hoosick and I refused to do it. Then she suggested that if he had poisoned himself would not the town bury him and I said 'No,' I said the place for him was right with her, and after a while she went and talked with the people and some young man came and said 'better let him bring it in' and then she consented;" that she also said she didn't own the house or control it and she didn't know whether the body could be brought in there or not.

The witness was then asked how she appeared at that time and answered that she was perfectly calm and not excited.

Knapp further testified that on his return from muster Wednesday evening she was in front of the armory and they went to Perham's together and stayed that night; that she told him that she last saw her husband between half past six and seven the evening before at Cooper's bridge, that her husband wanted her to go to live with him but she refused and he gave her the insurance policy and told her he had nothing to live for; that he had threatened to commit suicide and she was worried about him; that on Thursday morning after the body was found she asked the witness what he

thought about having it brought to the Perham house, and he told her he thought it would be policy to have it put there; that on the evening of that day the witness received a note from the petitioner asking him to come down to Perham's and spend the evening as it was lonesome, and after her arrest and while she was in jail at Bennington, he received a letter from her in which she said: "My God, Perham has let it all out."

Several witnesses testified that after the homicide and before the body was found the petitioner told them severally that she last met her husband about six o'clock Tuesday evening; that he tried to have her go back to William Rogers's with him, and when she refused he threw the insurance papers into her lap and said he had nothing to live for, and that he talked about poisoning himself and drowning himself, and she feared that he had committed suicide and that his body would be found within the limits of the village of Bennington.

While the autopsy was being performed she asked the doctors performing the same, two or three times, if they found any poison in the stomach, or if they found any traces of poison.

Mrs. Perham testified that after the body was discovered the petitioner told her in effect that she was going to have $500 insurance money and if the witness would let the body be put in her house the petitioner would pay her. The witness further testified that during the time of the inquest the petitioner said to her: "You and Leon are wanted down there," and that she said to Leon: "I want you to go down and testify as I want you to."

Several witnesses testified to the finding of the hat tied to the bough of a tree in Morgan's Grove with a note pinned to it. The hat was identified as that belonging to Marcus Rogers, and the handwriting of the note was by the evidence

of several witnesses, some of them experts, shown to be that of the petitioner.   This note purported to have been written by Marcus Rogers and read as follows: "Blame no one as I have at last put an end to my miserable life as my wife knows I have every threatened if, every one knows I have not anything or nobody to live for no one can blame me.   And so blame no one as my last request.

Marcus  Rogers.

May I hope you will be happy."

Six or eight witnesses who testified to her declarations subsequent to the homicide and before her arrest regarding her husband, when she last saw him, how she feared he had committed suicide, her inquiries of the doctors during the autopsy, and of the selectman relative to the town's burying the body, her talk at the house of the Phillputts, say in effect that she was cool and not excited with the exception of two of the witnesses who saw her at Mrs. Phillputt's Wednesday afternoon.   They say that when Mrs. Phillputt asked the petitioner "what she had done with Mark," they thought she acted a little nervous, as though she was worried about him.

We have not referred to all the evidence bearing upon her actions and declarations, nor is it necessary.   The evidence to which reference has been made as well as other evidence not especially referred to strongly tends to show that she refused to go to keeping house · with her husband upon his numerous requests, and that for sometime prior to the time of the homicide she was deliberately planning to get rid of him by taking his life and to that end sought the assistance of certainly two young men with whom she was criminally intimate, and when the crime was in fact committed it was done with the agencies which she and her accomplice had secured and carried with them for that purpose.

The note written by her and pinned to her husband's hat shows that in planning to commit the crime it was a part of the scheme to make it afterwards appear to be a case of suicide, and after the homicide, in the further carrying out of that plan, she advanced the theory and tried to create the impression that her husband had committed suicide.   Her visit to the furniture dealer, her actions and sayings while there regarding the purchase of furniture and the payment therefor, and her getting married, etc., all strongly tend to show that she was in possession of her full mental faculties and acting understandingly.

She was then coolly and deliberately engaged in a business transaction, looking to the accomplishment of her purpose to effect the death of her husband, that she might get his life insurance and marry Morris Knapp.

The evidence discloses nothing in her actions or declarations prior to the time of the homicide nor afterwards tending to show that she was mentally unsound, or was in anywise irresponsible for her acts.

The evidence tending to show insanity of the petitioner is confined to the testimony of Dr. McWayne.   So far as appears he was a general practitioner with no experience with phases of insanity which he describes beyond what that practice would give him.   His affidavit stands entirely alone in support of any theory of insanity during the time of the petitioner's pregnancy.   No relative or friend or other person with whom she associated has testified to any abnormal act or saying by her during that period.   The case is destitute of any evidence that she showed any signs of insanity at any other time within the period of her pregnancy.   It is to be noticed that the time when Dr. McWayne examined her was during the same week in which she was engaged in looking over and buying furniture at Charles Potter's store, the details

of which already appear. Her actions and declarations in that transaction instead of showing an unsound mind clearly show her to have been in full possession of her mental faculties, knowing what she wished to purchase, planning the ways and means for making payments, and arranging with the dealer regarding the same. Everything that Dr. McWayne's affidavit contains regarding her actions and declarations may be accounted for upon the ground of an outburst of temper.

It is significant that the petition for a new trial contains the evidence of no one in Bennington where she was staying for weeks prior to the homicide, nor of the doctors who performed the autopsy and saw her with her actions and sayings on that occasion, nor the selectman and health officer having the body in charge, nor of the persons at the jail where she was imprisoned before going to the House of Correction, nor of any one at the House of Correction where her child was born, showing their observations of her actions and sayings, and that in their opinion, based thereon, she was insane. In this connection it is to be noted that attached to the petition is the affidavit of Dr. E. G. Hall of the city of Rutland who testifies that he attended the petitioner during her imprisonment at the House of Correction when she was delivered of her child which occurred December 16, 1902, and his name signed to the affidavit shows that he was a physician to the House of Correction. The fact that, in that affidavit, he simply testifies to his attendance upon her at the time of the birth of the child and to nothing else, is very significant of the fact that there was nothing else that he could say in aid of the petitioner in seeking a new trial upon the ground of insanity; for otherwise it is fair to assume that the affidavit would have shown it. In *Doherty* v. *State of Vermont.* 73 Vt., 380, it is said: "If one's mental and moral faculties are so disordered and deranged that he cannot distinguish be-

tween right and wrong, or is not conscious at the time of the nature of the act he is committing, or if conscious of it and able to distinguish between right and wrong, yet if his mind or will is, involuntarily, so completely destroyed that he cannot control his actions, he is in a legal sense insane and is not subject to punishment for criminal acts committed when in such a state."

But it is not enough to say that the mind is so impaired that it is incapable of distinguishing between right and wrong, the mind must be so overcome that it has no power to resist the insane impulse to commit the deed, so that the act is the direct and immediate consequence and result of the insanity, in short that the deed is an insane act, in respect to which the reason is powerless. *Hathaway's Admr.* v. *National Life Ins. Co.*, 48 Vt., 335.

Upon consideration of the evidence introduced at the trial and of the affidavits produced in support of this petition, we can have no reasonable doubt that the petitioner at the time of the homicide had the mental ability to distinguish right from wrong, to fully comprehend the nature of the act she was about to commit and that she had sufficient will power to enable her to refrain from committing the crime. She deliberately exerted her will power to commit it. She as deliberately planned the theory of suicide to conceal the crime; and it was to this end that she told Mrs. Perham and Leon that they were to testify at the inquest as she wanted them to. Her own position at the inquest was one of ignorance of the means of her husband's death in the hope that the theory of suicide would be adopted. She had a sound and healthy mind in operation, not an unsound and diseased one. She had intelligence, not perverted intelligence. She reasoned, and it was the reasoning of sanity, and not of insanity.

The evidence at the trial strongly tended to show the petitioner guilty of murder by the wilful, deliberate and premeditated killing of her husband, and on a careful consideration of the evidence adduced in support of the petition it is not in our judgment of sufficient force to change the result were a new trial granted.

Upon the whole case the Court are of the opinion that *the petition ought to be, and the same is, dismissed.*

Rowell, Chief Judge, Tyler, Munson, and Start, Judges, concur.

Haselton and Powers, Judges, dissent on the question of insanity.

———

HASELTON, J., dissenting. I am compelled to differ with the majority of the Court, and feel bound to give some expression to the grounds of dissent.

The affidavits attached to the petition for a new trial tend to show that the petitioner, Mary Mabel Rogers, was born in March 1883; that she was of low mentality, emotional, and excitable; but the affidavits do not fairly tend to show a condition of general insanity. It appears that she was robust in body, and probably somewhat prematurely developed physically. It is sufficiently established that when she was about 11 years of age she attended school at Hoosick Falls, and that at that time she was so fantastic and eccentric as to be the butt of ridicule in the school, and that she seemed to take pride in the fact. Her condition at that time seems to have approached lunacy; and, as there is no evidence of the continuance of the peculiarities which made her ridiculous, they were not unlikely due to physical disturbances attendant upon her arrival at the age of puberty, which there is reason to believe was in her case somewhat premature. At the age of 15

years and some months she was married to Marcus Rogers. The marriage was performed by a clergyman, her age being certified to as 18. The deception in regard to her age was probably made possible by her somewhat premature physical development already referred to.

About March 16, 1902, when 19 years of age, she became pregnant, and a few months thereafter lapsed into gross immorality, carried on without concealment and apparently without shame. On or about August 7, 1902, Dr. Leroy D. McWayne, of Hoosick Falls, had his attention called to her condition in respect to soundness of mind, by Marcus Rogers, her husband. A few days afterwards Mary Rogers herself called on the Doctor at his office, and asked the Doctor to prescribe for her certain dangerous drugs. The Doctor had in mind the suggestion or caution received from her husband a few days before, and observed that she was "in a highly nervous mental state of mind," and he refused her request. "Whereupon," to quote now the exact language of the deposition of Dr. McWayne, "the said Mary Rogers flew into a violent passion, soundly berated this deponent for refusing her request, and threatened to kill this deponent, if he did not prescribe for her as requested by her. This deponent then tried to reason with and calm her, and after calling for assistance and using much persuasion, induced her to leave his private office and go into his reception room, where this deponent had a long conversation with the said Mary Mabel Rogers, and where this deponent, in the presence of this deponent's wife, examined the said Mary Mabel Rogers as to her sanity and mental state. That after a careful examination of the said Mary Mabel Rogers there and then, this deponent then determined that the said Mary Mabel Rogers was then suffering with puerperal insanity. This deponent further says that on

said Sunday, August 10, 1902, at the time said Mary Mabel Rogers called at this deponent's office, the said Mary Mabel Rogers was temporarily insane, caused as this deponent believes by pregnancy, in which condition she was at that time."

The Doctor had, on many occasions for several years previous to this time, professionally treated and prescribed medicine for Mrs. Rogers, and in arriving at his conclusions had the benefit of his knowledge of her mental and bodily makeup so derived. The Doctor was correct in determining that she was pregnant, for about four months later she was delivered of a still-born child. Was he mistaken in his diagnosis of her mental condition? His own affidavit is to the effect that he had been a practicing physician for 30 years, and had practiced for the last 20 years in the village of Hoosick Falls. Dr. George W. Lamb deposes that since 1880 he has been a practicing physician in the village of Hoosick Falls; that he has well known Dr. McWayne of that village for upwards of 20 years; and that Dr. McWayne is a highly respected person and a physician of high professional standing.

It is probable from the evidence in the case that Dr. McWayne is mistaken in fixing Sunday, August 10, as the day on which he made his examination of Mary Rogers; but this mistake, if it was a mistake, ought not to be treated as discrediting the affidavit of the Doctor. To do so would be to treat it in a manifestly unfair and unjust way. He says the examination of Mary Rogers was made a few days after the talk with her husband about her mental condition, and that that talk was on or about August 7. Whether this examination was made August 9, 10 or 11, is wholly immaterial; the precise day is immaterial. The tragedy of the death of Marcus Rogers was impending, for he was killed on August

12, and the affidavit of Dr. McWayne bears internal evidence of truthfulness, skill, and professional insight.

Dr. McWayne did not qualify as a specialist on insanity, but it was not necessary that he should do so. Reference is here made to *Hathaway* v. *National Life Insurance Co.,* 48 Vt. 335. In that case physicians and surgeons, one of whom was Dr. Goldsmith, testified as experts upon the question of insanity, without qualifying otherwise than as physicians and surgeons. No question was raised in the county court that these witnesses were not experts, but in considering objections to their testimony made on other grounds, the Supreme Court, speaking through Judge Pierpont, took occasion to say: "The principle is well settled that physicians and surgeons of practice and experience are experts, and their opinions are admissible in evidence upon questions that are strictly and legitimately embraced in their profession and practice, and it is not necessary that a witness of this class should have made the particular disease involved in any inquiry a specialty to make his testimony admissible as an expert. If he has, that, perhaps, may make his opinion of more value than that of one who has not."

It is urged that Dr. McWayne does not give the "long conversation" which he had with Mrs. Rogers in his reception room, and that he does not expressly say that his opinion is based upon observations of her and conversations with her. But stress should not be laid upon this fact in the consideration of a matter which calls for solemn consideration, unembarrassed by technicalities. The affidavit sufficiently discloses what opinion the Doctor would give in another trial under any form of question that might be employed, and that he would have a substantial basis for his opinion.

Such being the evidence as to the insanity of Mrs. Rogers at a time of physical derangement, the affidavits tending to show insanity in those of her blood, at times of physical derangement, are treated as admissible, particularly since the evidence tends to show that those in whom it exhibited itself had her general temperament.

The affidavits in this case tend to show a predisposition to insanity, and insane acts, on both the father's and the mother's side. They tend to show that the father frequently threatened the life of his wife while she was with child, and that before Mary was born he frequently made threats that if a child was born to him he would kill it; that a few days after the child was born he attempted to kill her by smothering her with a pillow, but that he was baffled in this attempt; that when the child was about 6 months old he persuaded the wife to take the child and go with him to Utica, N. Y., and that there in a room of a hotel he made several attempts to kill the child, and that in one such attempt he so nearly succeeded in poisoning the child with laudanum that a physican was called, who saved the life of the child only after several hours of labor. The affidavits show pretty clearly that the father was a victim of alcoholism, and that his homicidal tendencies and attempts manifested themselves, for the most part, in connection with alcoholic indulgence. But the force of the evidence as to the doings of the father is this; that it tends to show that he was so constituted that a derangement of his physical functions gave rise to a homicidal tendency amounting to a homicidal mania. The affidavits tend to show that the same Charles Bennett, father of Mrs. Rogers, was mentally low and weak.

The newly discovered evidence as to insanity on the mother's side relates to Patrick Dwyer, a brother of the

mother of Mary Rogers. This evidence tends to show that Patrick was for a time insane, and was watched lest he should take his own life. No suspicion can be cast upon this evidence, as the said Patrick Dwyer was committed to the Hudson River State Hospital for the Insane on the affidavits of Dr. John H. Chipperly of Troy, and Dr. J. C. Harmon, of Hoosick. If the affidavits on which he was committed are looked into, and there is no reason not purely technical why they should not be examined, evidence is disclosed that he attempted suicide by cutting his throat, and, further, that he took an aversion to his children and threatened their lives. In *Hathaway* v. *National Life Ins. Co.*, 45 Vt. 335, this Court said: "Suicide, like any other extraordinary and unnatural act, has a tendency to show insanity." See also *Frary* v. *Gusha*, 59 Vt. 257, and cases there cited. The insanity of Patrick Dwyer was apparently of a temporary character, as after a few months he was discharged as improved. What the exciting cause was which in his case induced insanity does not appear; but as it was apparently somewhat temporary in its character, it is fair to presume that it was due to some exciting cause operating upon a mind predisposed to insanity.

Affidavit is made that the mother of Mrs. Rogers is a woman of very low intelligence and mentally weak, and that Mrs. Rogers possesses many of the characteristics of both her father and mother. It would not be improbable that such a woman, with such a taint of blood, would be temporarily insane during some period of pregnancy, as well as at other crises incident to motherhood or womanhood.

The affidavits accompanying the petition for a new trial are to be weighed with all the evidence taken on trial, but it is to be remembered that the defence of insanity was not made on the trial, and that the gleanings from the evidence that are

thought to bear on that question are mere gleanings from evidence that was introduced with reference to another defence.

As a reason why there was no neglect on the part of counsel in not interposing the defence of insanity, it is to be noted that counsel was not assigned for her until 5 or 6 months after the birth of the child, long after the condition which, in the opinion of Dr. McWayne resulted in temporary insanity, had subsided. The affidavits of Mr. Guiltinan, assigned to defend, and of Mr. Archibald, who assisted in the defence, show no laches, or, at least, none the consequences of which ought to be visited upon Mrs. Rogers in the situation in which she now stands.

Brief reference will now be made to the evidence on the trial of the petitioner, which, though the defence of insanity was not made, may be thought to throw some light upon the question of her insanity. It is urged, in effect, that in the killing of her husband, she proceeded with reason and shrewdness. In the majority opinion a standard of sanity is in reality set up, and in view of what is there said, it is permissible to quote from the opinion in *Hathaway* v. *National Life Ins. Co.,* 48 Vt. 335, where Judge Pierpont, speaking for the entire Court, well and forcibly says: "Insane persons may form plans and execute them, and manifest great shrewdness and mental activity both in forming and executing them. Insanity does not destroy the intellect—it perverts it, and often renders it more active than it is in its normal condition."

Evidence on the trial tended to show that shortly before the homicide, and when this insurance idea had taken possession of her, she at one time spoke of the insurance as $1,000, at another as $5,000, and at another as $500.

It appeared from the testimony of Leon Perham that about a week before the homicide she broached to Leon a

scheme for going to Hoosick Corners and making an arrangement for getting Marcus out beside the river and knocking him on the head and rolling him into the river. At that time she spoke of his insurance and called it $1,000. The evidence tended to show that two days before the killing of her husband she asked Levi Perham to take her down to Hoosick Falls for the purpose of aiding her in killing a man who, she said, had some insurance and a little property that was in her name and which she wanted. The plan that she developed according to the testimony of Levi was to get the man out and get him to play tricks and jump the rope and tire him all out and tie his hands, when she was to step back and hit him with a club, and Levi was then to put the chloroform to him. At this time her husband Marcus whom she thought to tire out by getting him to jump the rope was upwards of thirty years old. Levi testified that he told her he would do as she asked, but that he had no idea of doing so; that he assented so that she would not ask him again; that he did not know what to make of it.

The evidence tended to show that Mary Rogers in the latter part of July, told Morris Knapp that Marcus Rogers was her husband, and that at that time she told Knapp that she had been to Hoosick or Hoosick Falls to attend the wedding of Marcus to some one other than herself. The evidence tended to show that on the occasion of the autopsy she was in the room with the body a part of the time in the presence of two doctors and several other persons, with papers in her hands which in the presence of all she called her insurance papers.

The evidence tended to show other weird, strange, and unnatural actions and sayings of Mary Rogers at about the time of the homicide, and at about the time when in the opin-

ion of Dr. McWayne, she was suffering from the insanity of pregnancy.

We are of opinion that under the rule announced in the Doherty case, 72 Vt. 381, and under the rule stated in the majority opinion in this case, the petitioner should be accorded a new trial on the ground of newly discovered evidence of insanity. The other grounds on which the petition is based are, as presented, deemed insufficient.

*Powers,* J. concurs in the dissenting opinion.